

NUMBER 13-07-00454-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

EDWARD LEE ROBINSON,                              **Appellant,**

**v.**

THE STATE OF TEXAS,                                  **Appellee.**

**On appeal from the 156th District Court
of Bee County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Chief Justice Valdez**

A jury convicted appellant, Edward Robinson, of one count of aggravated sexual assault of a child under fourteen years of age and assessed punishment at ten years' imprisonment.  *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(B) (Vernon Supp. 2008).  The trial court signed a judgment of conviction and sentence in accordance with the jury's

verdict. By a single issue, Edward challenges the factual sufficiency of the evidence supporting his conviction. We affirm.

## I. BACKGROUND

The sexual assault allegedly occurred in August 2006, when F.R., Edward's six-year-old daughter, spent a week with Edward in Beeville, Texas. After F.R. returned home to A.R., her mother, she outcried, and A.R. contacted the authorities. Edward was indicted on two counts of aggravated sexual assault of a child; he pleaded not guilty to both counts, and the case was tried before a jury.

After being questioned by the trial court about the difference between the truth and lies, F.R. testified that she was seven years old at the time of trial, Edward was her father, and she had two brothers, L.R., age six, and I.R., age four. F.R. further testified that Edward did not live with A.R. and her brothers; instead, he lived with his father in Beeville. F.R. testified that she and her brothers would visit Edward and that during one visit, she was laying on Edward's bed with him when he made her "suck on his wee-wee" because "he said it felt good." During this incident, F.R.'s younger brothers were laying on a mattress on the floor of the same room.

Rudolfo Gonzales, a San Antonio police officer, testified that on August 11, 2006, he responded to a call from A.R. regarding a report of sexual assault of a child. Officer Gonzales visited with A.R. and F.R., and he instructed A.R. to take F.R. to Santa Rosa Children's Hospital for an examination and to contact the Beeville Police Department.

A.R. testified that she and Edward were married from October 1999 through February 2007 and that they were "always separating and then getting back together."

2

After the divorce, the children visited Edward in Beeville about once a month. In August 2006, the children stayed with Edward for a whole week. A.R. testified that the day after the children returned from their week-long visit with Edward, she and the children were at their dinner table eating lunch, discussing how Edward cooked food, when F.R. said Edward did two things that she did not like; F.R. said the second was making her finish her plate of food and Edward had promised not to do the first thing again. A.R. was concerned about what the "first thing" might be, and she talked to F.R. in private. In private, A.R. testified that F.R. told her that Edward "put his wee-wee in my mouth." A.R. then asked F.R., "Does your daddy ever touch you?" F.R. responded, "yes," and rubbed her crotch area over her clothes. A.R. called her boyfriend, who instructed her to dial 9-1-1.

A.R. further testified that Officer Gonzales responded to the call, spoke with F.R., and instructed A.R. to take F.R. to the hospital for an examination. A.R. took F.R. to the hospital, where F.R. was examined by a sexual assault nurse examiner or "SANE nurse." A.R. also took F.R. to a Child Protective Services ("C.P.S.") worker and a counselor. On cross-examination, A.R. testified that she was engaged to Brian, Edward's stepbrother, and the two had dated and lived together "on-and-off" for the past year. A.R. testified that F.R. was Edward's child, but she did not know whether Edward fathered her other two children.

Irma Padron, a C.P.S. investigator, testified that she received a report of possible abuse regarding F.R. and began an investigation. Padron interviewed F.R., A.R., and F.R.'s siblings.[1] After the interviews, Padron concluded that there was "reason to believe" abuse had occurred. Padron drafted a report and conferred with law enforcement officials.

Rebecca Pena, a SANE nurse at Santa Rosa Children's Hospital, testified that she

---

[1] Padron's interview with F.R. was recorded onto a DVD. The State offered the DVD as an exhibit, but the trial court denied its admission.

spoke to F.R. alone. Pena asked F.R. why she came to the hospital, and F.R. replied, "I told Momma that Daddy told me sometimes to suck on his wee-wee. I told him I don't like it but he says it feels good. He said okay, but he said you have to tell me if you told anyone else." Pena examined F.R., took DNA samples, and determined that F.R. did not have any injuries.

Michael Willow, a detective with the Beeville Police Department, testified he received a report of a sexual assault of a child that had allegedly occurred in Beeville from C.P.S. Detective Willow reviewed the C.P.S. report, a report by the San Antonio Police Department, a DVD of F.R.'s interview with Padron, a SANE report, and DNA samples. Detective Willow then concluded that there was probable cause to obtain an arrest warrant. Edward was arrested and given written *Miranda* warnings.[2] He signed a voluntary written statement, which was admitted into evidence and read to the jury, stating:

> My kids stayed with me for a week. My wife and I usually meet halfway in Floresville for a child exchange. I think that is where I picked them up this time. I told Detective Willow that I drink a lot and I have a bad drinking habit. There are times that I wake up the following day not remembering what I did the night before. Almost everyday of the week that my kids were down, I remember waking up with my daughter in bed with me. Sometimes, I was clothed and sometimes I wasn't. I don't remember trying to make a move on my daughter. If I were sober, I know that I would not do anything like that. I have a girlfriend that will give me a blow job anytime that I want one so I don't think that I would do that if I were drunk. My daughter has never told me that I did anything like that but she goes and tells her mom who in turn tells me.
>
> I can't actually say that it is hard to believe that I would do this to my daughter because of my drinking habit, but I believe that my mother in law has a lot to do with it. I believe that she is trying to brainwash my daughter. I try to stay away from my kids as much as possible so that they can't make these accusations. My wife [A.R.] got mad at me because I didn't want to

---

[2] *See generally, Miranda v. Ariz.*, 384 U.S. 436 (1966).

have [the children] for two months out of this summer so I believe that she is upset and is doing this on purpose.

My mind set is that I think they are fucking me over because they know I have a drinking problem and I don't want to believe that these accusations are true. I told Detective Willow that I know how I am when I get home from the bar, I told him that I am usually hot and horny and that sometimes, I wake up not knowing where the hell I am at or knowing how I got where I was. I know that I would not jump in bed and pull my damn dick out and tell my six year old daughter to suck my dick. My daughter was able to describe my penis because my kids see me naked all the time. I know that my daughter is real smart. Like I told you before, I know how I am when I come home from the bars but I can't believe that I would do anything like this.

On cross-examination by defense counsel, Detective Willow testified that, except for Edward, he did not interview any of the occupants of the house where the alleged sexual assault took place. Additionally, he did not have the DNA samples tested because "the allegations were made a few days after the actual offense occurred" and he "believe[d] that it wouldn't have been pertinent to this case."

Leonard Robinson, Edward's father and the only defense witness, testified that Edward lived with him "on-and-off" for three to four years; that Edward's girlfriend, Veronica, and her two teenage children also lived with him; and in August 2006, Edward's three children visited the house. Leonard further testified that all the children stayed in one bedroom, but in the morning they would be in Edward and Veronica's bedroom "all over the floor, bed, everywhere."

In a single charge, Edward was charged with two counts of aggravated sexual assault. The jury found Edward guilty on the first count and not guilty on the second count. It assessed punishment at ten years' confinement in the Institutional Division of the Texas Department of Criminal Justice. The trial court signed a judgment of conviction and

5

sentence according to the jury's verdict. This appeal, which challenges the factual sufficiency of the evidence supporting Edward's conviction, ensued.

## II. Discussion

When conducting a factual-sufficiency review, we view all of the evidence in a neutral light. *Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 416 (Tex. Crim. App. 2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id.*

Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. In conducting a factual-sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *See Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

"Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699,

705 (Tex. Crim. App. 2008). "The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Id.* The jury may choose to believe some testimony and disbelieve other testimony. *Id.* at 707.

A person commits aggravated sexual assault if he intentionally or knowingly causes the penetration of the mouth of a child by the sexual organ of the actor. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(ii). A child's testimony alone is sufficient to support a conviction for aggravated sexual assault. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.–Dallas 2002, pet. ref'd).

On appeal, Edward points to three instances in which he contends the evidence is factually insufficient. First, Edward complains that his conviction rests solely on F.R.'s testimony. Yet, F.R.'s testimony is sufficient to support Edward's conviction. *See Tear*, 74 S.W.3d at 560. Second, Edward argues, without any citation to legal authority, that Detective Willow did not conduct a thorough investigation, and the allegedly inadequate investigation presumably undermines his conviction. The jury, as the sole judge of Detective Willow's credibility and the weight of his testimony, was free to assess the thoroughness of his investigation. *See generally, Lancon*, 253 S.W.3d at 705; *see also Tyrone v. State*, No. 04-97-00073-CR, 1998 Tex. App. LEXIS 1283, at *3-6 (Tex. App.–San Antonio Feb. 27, 1998, pet. ref'd) (not designated for publication) (overruling a factual sufficiency challenge where the appellant complained about the inadequacy of the police investigation). Finally, Edward contends that his voluntary statement "raises at least the possible motive for the victim and her mother, the recipient of [F.R.'s] outcry statement, to

fabricate the allegation against [him]." Once again, the jury was free to weigh Edward's statement as it saw fit. *See Lancon*, 253 S.W.3d at 705.

Viewing the evidence in a neutral light, we conclude that the evidence is not so weak that the jury's verdict seems clearly wrong and manifestly unjust, and that the jury's verdict is not against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15. Edward's sole issue is overruled.

### III. CONCLUSION

The trial court's judgment is affirmed.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish. TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 8th day of January, 2009.